# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WILLIAM REID and RENEE PICL | |
| Plaintiffs, | |
| | Case No. 05 C 5375 |
| v. | |
| | Judge Joan B. Gottschall |
| HARVEY MOTORCYCLE AND CAMPER d/b/a WATSON MOTORSPORT, LTD., | Magistrate Judge Maria Valdez |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

For the reasons set forth below, defendant Harvey Motorcycle and Camper d/b/a Watson Motorsport, Ltd.'s ("Watson") motion to dismiss counts II, III, and IV of plaintiffs William Reid's ("Reid") and Renee Picl's ("Picl") first amended complaint granted with respect to counts II and III and denied with respect to count IV.

### I. BACKGROUND

Picl and her fiancé, Reid, wanted to buy a used car to ease the burden of their daily commute. Picl, who was three months pregnant at the time, owned a Dodge Neon (the "Neon"), which was the couple's sole source of transportation, and Reid and Picl desired a second car so that Picl would not have to drive Reid to and from his place of employment each day. They decided to shop for a previously-owned vehicle at Watson, a used car dealership, in the hope of finding a reasonably priced automobile that would accommodate their needs. Arriving at Watson on September 18, 2004, Reid and Picl encountered salesman Erik Garcia ("Garcia"), and told him that, due to Picl's delicate

1

condition, they were seeking a car that was "child-friendly." Garcia introduced Reid and Picl in turn to a finance manager named Gaylan Montjoy ("Montjoy"). Seeing that Reid and Picl hoped to obtain financing for the vehicle that they wished to purchase, Montjoy allegedly offered to run both Reid's and Picl's credit histories to learn who might be more eligible for dealer-based financing via Watson. After allegedly checking both Reid's and Picl's credit scores, Montjoy allegedly rejected Reid, claiming that ownership of the vehicle should be in Picl's name due to her higher credit rating.

After touring the lot, Reid and Picl chose a 2004 Mercury Sable (the "Sable") as appropriate to their needs, and then the parties allegedly negotiated a price for the vehicle. However, after negotiating the price, Garcia and Montjoy allegedly informed Reid and Picl that the bank that would not finance their purchase because of Picl's existing credit obligation on her Dodge Neon. Montjoy allegedly then told the couple that the only way to obtain financing was for Reid and Picl to purchase two vehicles from Watson, trading in the Dodge Neon. Reid and Picl consequently returned to the lot and selected a 2003 Chrysler Sebring (the "Sebring"). After discussing with Reid the price and the financing terms of the proposed deal, Picl signed the necessary papers and the couple drove home in the Sable and the Sebring, leaving the Neon behind at Watson.

Approximately three and a half weeks later, Garcia contacted Reid and allegedly informed them that Picl could obtain a better financing rate on the two cars. Reid proceeded to Watson, where he encountered Garcia and Montjoy, who allegedly repeated the proposal that Picl could obtain a more advantageous rate of financing for the two purchased vehicles. However, after allegedly waiting for some interval of time, Reid was introduced to a man he believed to be the finance manager, one Gabe Knapp ("Knapp").

Knapp allegedly informed Reid that the representations made by Garcia and Montjoy were not true and, in fact, the dealership had not been able to obtain financing for either the Sable or the Sebring. Moreover, Knapp allegedly informed Reid that if he and Picl desired to keep the cars, the interest rate on the financing of the vehicles would be doubled. Reid allegedly responded by offering to call off the whole deal, taking back the Neon and returning the Sable and the Sebring, but was allegedly informed by Knapp that the Neon was no longer in Watson's possession. Reid was allegedly then importuned by yet another Watson representative, Yeddy Israel ("Israel"), who claimed that Picl would have to return to the dealership to sign a new financing contract on the Sable and the Sebring.

The following day, Reid and Picl returned to Watson, allegedly hoping to return the Sebring and Sable, reclaim the Neon, and generally call off the whole deal. Instead, Picl ended up signing the new contracts, and were allegedly informed by Israel that the cars had been successfully financed.

Less than a week later, Reid was again contacted by Garcia, who allegedly claimed, yet again, that there was a "problem with the paperwork" on the purchase of the Sebring. Reid and Picl once again proceeded to Watson, and thereafter Picl allegedly once more signed a contract on the Sebring and was told that the car had been successfully financed on Picl's credit.

This pattern repeated itself on October 29, 2004, when Garcia again called Reid, allegedly claiming that there was yet another "minor problem" with the paperwork on the deal. Reid and Picl traveled once more to Watson, where Montjoy and Israel once again allegedly informed them that the financing of the deal had fallen through because of

paperwork errors. Reid allegedly offered once more to return the Sebring and Sable in exchange for the Neon but was informed again that Watson no longer had possession of the Neon and therefore could not return it. Reid and Picl were then allegedly "cornered" in a small room and subjected to threats and pressure by Montjoy, who allegedly told them that the police would take Watson's side in a dispute due to connections between Watson and the Midlothian Police Department. Israel and Montjoy then assured Reid and Picl that Watson could arrange financing for them on either a 2-door Chevy Blazer pickup truck (the "Blazer"), or a 2-door Saturn with a manual transmission. Neither of these was acceptable to Reid and Picl, who allegedly desired a more "family friendly" car with an automatic transmission.

After allegedly listening for over an hour to Montjoy's and Israel's blandishments, Picl agreed to test drive the Blazer. In the meantime, Reid was allegedly subjected to continuing pressure from Montjoy to agree to Watson's proposed latest version of the deal. Reid subsequently took the Blazer for a test drive and, upon completion of Reid's test drive, Reid and Picl were informed that these were the only two vehicles on Watson's lot for which financing could be arranged. However, upon being informed of the price of the Blazer, Reid and Picl refused to proceed, allegedly because they could not afford that truck.

Events went downhill from there; Reid allegedly suggested alternate prices that were summarily rejected by Garcia and Montjoy. After some time, when the latest of these was communicated to Israel by Garcia and Montjoy, Israel allegedly responded with loud and public abuse and ordered Montjoy to call the police. When Reid and Picl then attempted to leave the dealership in the Sable (which was not part of the dispute) an

employee of Watson allegedly barred their leaving by driving a vehicle in back of their parking stall, preventing them from exiting. The Midlothian police then arrived upon the scene. After a routine identity check, Reid was taken into custody on the grounds of an outstanding warrant for an alleged traffic violation. While in custody, Reid was allegedly informed by a police officer, who claimed to have spoken to Israel, that the Sebring would need to be returned to Watson within 24 hours or Picl would face arrest.

Consequently, Reid and Picl returned the Sebring that evening to Watson and, allegedly believing that she had no other choice given their need for two vehicles, Picl signed the contract for the Blazer. Reid alleges that because they cold not afford the higher payments on the Sable and Blazer, Reid and Picl were forced to abandon their apartment and move in with Reid's parents.

Picl's subsequent claims against Watson for, *inter alia*, common law and consumer fraud, intentional infliction of emotional distress, and violation of the Equal Credit Opportunity Act ("ECOA") were fully adjudicated through arbitration. Reid, who was not a signatory to any of the automobile contracts, has subsequently filed an amended complaint against Watson, alleging violation of ECOA (count I); violation of the Illinois Consumer Fraud and Deceptive Practices Act (the "Consumer Fraud Act") (count II); and common law fraud (count III). Picl joins Reid's complaint, seeking attorneys' fees associated with Picl's attempts to enforce the May 26, 2006 final award of the arbitrator. Presently before the court is Watson's motion to dismiss counts II, III, and IV of Reid and Picl's complaint under Federal Rule of Civil Procedure 12(b)(6).

**II. ANALYSIS**

When considering a motion to dismiss for failure to state a claim under which relief may be granted under Federal Rule of Civil Procedure 12(b)(6), all well-pleaded allegations of the complaint must be accepted as true and the court must draw all reasonable inferences in favor of the plaintiff. FED. R. CIV. P. 12(b)(6); *McMillan v. Collection Prof'ls., Inc.*, 455 F.3d 754,758 (7th Cir. 2006). Moreover, although a plaintiff need not generally plead particularized facts, the factual allegations in the complaint must be enough to raise a right to relief above the level of mere speculation. *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007). However, when alleging claims of fraud or mistake, Federal Rule of Civil Procedure 9(b) requires the plaintiff to plead with specificity the who, the what, the where, and the when of the alleged fraud. FED R. CIV. P. 9(b); *Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins.*, 412 F.3d 745, 749 (7th Cir. 2005). A motion to dismiss may be granted only when it appears beyond doubt that plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief. *McCready v. eBay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006).

A. Count II: The Consumer Fraud Act

> The Consumer Fraud act makes unlawful:
>
> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of any trade or commerce.

815 ILCS § 505/2. The Consumer Fraud Act was intended to provide a broader range of protection than the common law, and is therefore liberally construed to achieve its

purposes. *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 751 (Ill. 1994); *Hoke v. Beck*, 587 N.E.2d 4, 8 (Ill. App. Ct. 1992). Under the Consumer Fraud Act, a plaintiff must show: (1) a deceptive act or practice; (2) an intent by the defendant that the plaintiff rely on the deception; (3) the deception occurred in the course of conduct involving trade or commerce; (4) actual damages to the plaintiff; and (5) proximate causation between the deception and the plaintiff's damages. *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002); *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996). Moreover, the requisite "intent" is only the intent that the plaintiff in the primary action rely on the information that the defendant gave him or her, as opposed to an actual intent to deceive. *Cuculich v. Thomson Consumer Electronics, Inc.*, 739 N.E.2d 934, 939 (lll. App. Ct. 2000). Significantly, the Act does not require actual reliance upon the part of the plaintiff. *Siegel v. Levy Organization Development Co., Inc.*, 607 N.E.2d 194, 198 (Ill. 1992).

Viewing the facts alleged in the complaint in the light most favorable to the plaintiff, count II of the complaint cannot survive Watson's motion to dismiss. Watson did make repeated deceptive or fraudulent calls to Reid concerning "minor paperwork problems" in attempts to lure him into returning to the dealership. Once there, Reid was presented with declarations that no financing of the contract already signed by Picl was possible, and was pressured to convince Picl to sign a new contract on multiple occasions. Watson's duplicitous telephone calls, made with the intent of inveigling Reid to the dealership where he would be subjected to pressure, satisfies the deceptive act or practice requirement of the Consumer Fraud Act. Moreover, the intent requirement is likewise satisfied. Under the Consumer Fraud Act, Reid need not allege facts

7

demonstrating that Watson intended to deceive him, but only that Watson intended for Reid to rely upon the information Watson provided, i.e., that there were paperwork problems requiring Reid to return to Watson to resolve. Reid alleges that he, in fact, did rely upon these representations.

Likewise false or deceptive statements were made to both Reid and Picl concerning the succession of contracts that were signed by Picl. Although Reid was not a signatory to any of these documents, representations were made to both Reid and Picl (and sometimes to Reid alone) in attempts to coerce Reid into influencing Picl to sign. In all of these dealings, Reid alleges sufficient facts to successfully argue that Watson's intent was that both Reid and Picl should rely on Watson's deceptive statements and sign the new contract.

All of the facts alleged by Reid in count II of the complaint center around the purchase of a succession of cars from Watson. It is therefore indisputable that the fraudulent or deceptive practices that Reid alleges against Watson arose in the context of trade or commerce. Reid's allegations therefore satisfy the third requirement of the Consumer Fraud Act.

However, Watson argues that because Reid was not a signatory to any of the contracts, he was not actually or proximally damaged by Watson's deceptive acts. The court agrees. The contract was entered into by Picl and Watson, and Reid was not a party to the allegedly fraudulent contract. Thus, the losses sustained as a result of Picl's reliance on Watson's fraudulent statement are Picl's alone. Reid was under no obligation to meet Picl's financial obligations under the contract. Although it is understandable that he may have made contributions to the car payments, the fact remains that Reid is a third
8

party. The damages were suffered by Picl, who has pursued them herself through arbitration. To award separate damages to Reid, who has not alleged damages suffered solely by himself and independent of those suffered by Picl, risks a double penalty against Watson for the same transaction.[1] Reid cannot show that he individually suffered proximate or actual damages as a result of Watson's actions that were independent of those suffered by Picl. He therefore cannot meet the fourth and fifth requirements specified for a cause of action under the Consumer Fraud Act.

Having thus failed to allege facts stating a claim for which relief may be granted under Federal Rule of Civil Procedure 12(b)(6), count II of Reid's complaint must be dismissed.

B. Count III: Common Law Fraud

Reid's count III is similarly flawed. The elements of common law fraud are (1) a false statement of material fact; (2) the defendant knew the statement was false; (3) the defendant intended that the statement induce the plaintiff to act; (4) the plaintiff relied upon the truth of the statement; and (5) the plaintiff suffered damages from his reliance on the statement. *Time Savers, Inc. v. LaSalle Bank, N.A.*, 863 N.E.2d 1156, 1167 (Ill. App. Ct, 2007). A complaint for common law fraud "must allege, with specificity and particularity, facts from which fraud is the necessary or probable inference, including what misrepresentations were made, when they were made, who made the misrepresentations and to whom they were made." *Id.* (quoting *Connick,* 675 N.E.2d at 496-97).

---

[1] Reid also alleges damages suffered as a result of his arrest by officers of the Midlothian Police Department during the altercation at Watson. However, Reid was arrested solely as a result of an outstanding traffic warrant. There is thus no causal nexus between Watson's acts and Reid's arrest, and Reid was therefore not proximately damaged by Watson in this respect.

Reid alleges with sufficient particularity the false statements made to him by Watson, both independently and when he was with Picl. The statements were material to the financing and purchasing of the various cars involved in the transactions. Reid alleges with clarity that both he and Picl were subjected, via false statements, to pressure, persuasion, and threats in order to cause Picl to sign the contracts. He alleges that Watson knew the statements which caused him and Picl to return to the dealership and the statements made to both Reid and Picl to allegedly coerce Picl into signing the contracts were false and were made with the intent that Reid and Picl would rely upon them. And Reid and Picl both allegedly felt that they had no choice in their dealings with Watson but to rely on Watson's statements and that Picl consequently signed the contracts. Because Reid and Picl were allegedly cohabiting and sharing expenses, both allegedly suffered damages when they were fraudulently induced to purchase the Blazer and consequently were forced to leave their apartment.

However, once again, Reid cannot allege facts sufficient to claim proximate or actual damages as a result of Watson's duplicity. In the world of common law fraud, cause-in-fact is defined as reliance. *Oliveira*, 776 N.E.2d at 150 (citing RESTATEMENT (SECOND) OF TORTS § 546, cmt. a (1977)). In other words, Reid must demonstrate that he entered into a transaction in reliance on Watson's fraudulent statements and suffered damages as a result of his reliance. Since Reid did not enter into a transaction with Watson in reliance on Watson's fraudulent statements, and cannot demonstrate any damages suffered individually by him alone, his claim once again fails at the fourth and fifth requirements, and the claim must be dismissed.

C. Count IV: Picl's Claim for Attorneys' Fees Associated with Actions to Enforce the Final Award of the Arbitrator.

Although Watson demanded that Picl submit their dispute to arbitration, as specified in the contracts' arbitration agreement, Picl ultimately prevailed and was awarded damages and attorneys' fees. Picl then filed a motion for entry of judgment upon the arbitration award. In response, Watson filed a petition with this court to vacate the arbitration award and, after the motions were fully briefed, the court granted Picl judgment of the arbitration award and denied Watson's motion to vacate. In count IV, Picl seeks attorneys' fees incurred in her attempts to obtain an order of judgment and to defeat Watson's order to vacate.

The language of the arbitration agreement is plain upon its face, and the relevant section reads:

> The arbitrator's award shall be final and binding on all parties to the arbitration. Either party may enter judgment on the award in any court. If either you or we are required to enforce this agreement in court, the prevailing party in such proceeding shall be entitled to its attorneys' fees and costs incurred in doing so.

Furthermore, both parties agreed to the arbitration agreement that the "agreement will be governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*"

The prevailing American rule is that both parties in federal litigation must pay their own attorneys' fees, absent statutory obligation or contractual agreement between the parties. *Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir. 1994) (citing *Ayeleska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 263-64 (1975)). Furthermore, the Seventh Circuit has held that there is nothing in the Federal Arbitration Act itself that would authorize a district court to go beyond an arbitrator's award and independently award any additional attorneys' fees incurred in confirming an arbitration award. *Menke*, 17 F.3d at 1009.

Since there are thus no statutory grounds for awarding attorneys' fees, the court must look to the wording of the contract to see if attorneys' fees should properly be awarded. *See Myers v. Popp Enterprises, Inc.,* 576 N.E.2d 452, 457 (Ill. App. Ct. 1991). Contractual agreements to award attorneys' fees are strictly construed under Illinois law. *Mirar Development, Inc. v. Kroner,* 720 N.E.2d 270, 274 (Ill. App. Ct. 1999).

The language of the contract states plainly that: "The arbitrator's award shall be final and binding on all parties to the arbitration." On its face, this represents an agreement that both parties will accept the decision of the arbitrator as final and binding. However, in contesting Picl's motion to enforce the judgment and moving to vacate the arbitrator's award, Watson breached its contractual agreement with Picl to accept and abide by the arbitrator's award, and attempted to have this court set the arbitration award aside. Watson was unsuccessful in this effort and Picl again prevailed. The contract further states: "If either you or we are required to enforce this agreement in court, the prevailing party in such proceeding shall be entitled to its attorneys' fees and costs incurred in doing so." Illinois courts have observed that "enforce" means to "compel obedience to" and have held that a party is entitled to an award of attorney fees under a provision awarding such fees only when she or he can demonstrate that the other party was compelled by the trial court to obey a condition of the contract. *Powers v. Rockford Stop-N-Go, Inc.*, 761 N.E.2d 237, 241 (Ill. App. Ct. 2001).

In this case, Watson has been compelled by this court to obey a condition of the contract, *viz.*, to accept the contractual agreement that the arbitration award is final and binding. Because Picl has alleged facts that adequately support her claim for attorneys'

fees in enforcing the arbitration award, Watson's motion to dismiss count IV for failure to state a cause upon which relief can be granted is denied

### III. CONCLUSION

For the reasons set forth above, Watson's motion to dismiss counts II and III for failure to state a claim upon which relief can be granted is granted. Watson's motion to dismiss count IV on the same grounds is denied.

ENTER:

                                                /s/
                                        JOAN B. GOTTSCHALL
                                        United States District Judge

DATED: November 30, 2007